EXHIBIT A TO
THE NOTICE
OF REMOVAL

ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Wednesday, June 7, 2023 10:42:56 PM
CASE NUMBER: 2023 CV 02962 Docket ID: 916399752
Mike Foley
CLERK OF COURTS MONTGOMERY COUNTY OHIO

## IN THE COMMON PLEAS COURT OF MONTGOMERY COUNTY, OHIO
## CIVIL DIVISION

| | | |
|---|---|---|
| **JENNA BURTON, D.O.** | | |
| **705 Belauto Ct., Apt. G** | | |
| **Dayton, Ohio 45430** | : | **CASE NO.** |
| | : | |
|    **Plaintiff,** | | |
| | : | |
|    **v.** | | |
| | : | |
| **KETTERING ADVENTIST HEALTH CARE,** | | **JUDGE:** |
| **3535 Southern Blvd** | : | |
| **Kettering, Ohio 45432** | | |
| | : | |
| **and** | | |
| | : | |
| **LYNDETTA SCHWARTZ, M.D., F.A.C.P.** | | |
| **3535 Southern Blvd** | : | |
| **Kettering, Ohio 45432** | | |
| | : | |
| **and** | | |
| | : | |
| **JOSHUA HAMILTON, M.D.** | | **DEMAND FOR JURY TRIAL** |
| **3535 Southern Blvd.** | : | **ENDORSED HEREON** |
| **Kettering, Ohio 45432** | | |
| | : | |
|    **Defendants** | | |

---

### AMENDED CIVIL COMPLAINT FOR BREACH OF CONTRACT,
### DISABILITY DISCRIMINATION AND TORTIOUS INTERFERENCE

---

Now comes the Plaintiff, Jenna Burton, D.O. ("Dr. Burton"), and for her Complaint for breach of contract, disability discrimination, and tortious interference (the "Complaint") against the Defendants, Kettering Adventist Health Care, d/b/a Kettering Health Network and d/b/a Kettering Medical Center (collectively "KMC"), Lyndetta Schwartz, M.D., and Joshua Hamilton, M.D., collectively the Defendants, sets forth the following averments of facts and assertions of law, to-wit:

## NATURE OF DR. BURTON'S CLAIMS

1.      This civil action on behalf of Dr. Burton seeks declaratory and injunctive relief and compensatory damages for the Defendants' violations of Dr. Burton's contractual due process rights stated in Dr. Burton's residency employment contract with KMC.  Dr. Burton brings this action to enforce her contractual rights, including the right to maintain her medical residency at KMC, her rights to notice and opportunity to be heard, and to keep her reputation and standing in the community.  Dr. Burton seeks financial compensation for KMC's breach of contract, including KMC's disregard of applicable disciplinary procedures, KMC's failure to place her on probation before terminating her employment, and KMC's failure to provide her with notice of disciplinary action and her right to appeal her termination, and for KMC's refusal to accept Dr. Burton's appeal of her termination.

2.      This civil action further seeks to enforce the rights of Dr. Burton to be free from conspiracies to discriminate by the Defendants, to be free from discrimination because of disability and perceived disability, and because she took a medically necessitated leave of absence.  This civil action specifically seeks to enforce Dr. Burton's rights to be free from unlawful disability discrimination and for taking leave as provided by the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the "Rehabilitation Act"); R.C. 4112.02 (the "Ohio Civil Rights Act, and to obtain compensation from Defendants for the Defendants' violations of her rights.

3.      This civil action additionally seeks declaratory and injunctive relief concerning KMC's breach of Dr. Burton's contract and the specific performance of her contract.  Dr. Burton seeks this Court to require that KMC rehire and reinstate her, without prejudice, to her former position as a medical resident in KMC's Internal Medicine Residency Program at her previous salary, plus raises, to provide Dr. Burton with reasonable accommodations, and to reinstate her employee

benefits, including professional liability insurance, disability insurance, and health, dental, vision and life insurance.  Dr. Burton further seeks this Court require the Defendants to cease further discriminatory actions against her,

4.      This civil action challenges KMC's decision to terminate Dr. Burton's residency and employment and KMC's refusal to accept her appeal of the decision to terminate her residency and employment.  Dr. Burton also seeks compensatory and punitive damages for the Defendants' violation of federal and state statutes prohibiting disability discrimination, and state common law prohibiting Defendants' intentional and malicious interference with her prospective contractual relationships and economic advantage in consequence of KMC's termination of her residency and the disruption of her medical career.

## JURISDICTION AND VENUE

5.      Jurisdiction of this Court is predicated on R.C. § 2305.01, providing for subject matter jurisdiction, and R.C. § 4112.99, concerning claims brought under R.C. Chapter 4112, prohibiting disability discrimination.   Venue is proper under Civil Rule 3(B), as KMC maintains its principal place of business in Montgomery County, Ohio, and because part or all of Dr. Burton's claims arose in Montgomery County, Ohio.

## PARTIES

9.      Dr. Burton is a Doctor of Osteopathic Medicine, licensed to practice medicine in the State of Ohio (training certificate), who at all times relevant to the allegations contained in this Complaint was a resident of Greene County, Ohio, and who brings this suit on her behalf.  Dr. Burton was formerly employed by KMC as a resident in KMC's Internal Medicine Residency Program.  Dr. Burton has certain medical conditions that substantially limit one or more major

life activities.  The Defendants know that she has these medical conditions, and the Defendants perceive her as having such conditions.

10.     Defendant KMC is an Ohio non-profit corporation operating hospitals, health care facilities, and educational institutions, including medical residency programs, all receiving various levels of federal financial assistance.  KMC operates under different registered trade names, including Kettering Medical Center and Kettering Health Network.  KMC is the recipient of substantial federal funding and was the employer of Dr. Burton.

11.     Defendant Dr. Schwartz is the Kettering Medical Center Program Director for KMC's internal medicine residency program and is listed as a staff member at KMC's Department of Internal Medicine.  Dr. Schwartz supervised Dr. Burton's residency at KMC and unlawfully terminated her employment.

12.     Defendant Dr. Joshua Hamilton was employed by KMC as a physician and was placed in a position to supervise physicians in the KMC internal medicine residency program, including Dr. Burton.  Dr. Hamilton supervised Dr. Burton's intensive care rotation during her residency at KMC and was instrumental in the unlawful termination of her employment.

## STATEMENT OF FACTS

13.     Dr. Burton is a graduate of the University of Tennessee, majoring in microbiology.  Dr. Burton attended the Lincoln Memorial University Debusk College of Osteopathic Medicine, where she attained her Doctor of Osteopathic Medicine degree.  After graduating from the Debusk College of Osteopathic Medicine, Dr. Burton sought employment in an internal medicine residency program offering the opportunity to specialize in interventional cardiology.  KMC recruited Dr. Burton to attend KMC's residency program, knowing that she sought admission in

KMC's residency program to pursue KMC's fellowship in interventional cardiology after completing KMC' residency program.

14.     In March 2018, Dr. Burton was accepted into the KMC medical residency program under a Graduate Medical Education Agreement with KMC on April 10, 2018 (hereinafter, the "Agreement").   Exh. A.   The Agreement has a three-year term, expiring on June 30, 2021. Pursuant to the terms of the Agreement, Dr. Burton was to be paid an annual stipend of $53,309 and an additional annual Primary Care Bonus of $6,000, payable at the rate of $1,500 per quarter. The Agreement provided that Dr. Burton would receive 15 paid vacation days per year, professional liability insurance coverage, disability insurance, and health, dental, and vision insurance.

15.     Besides specifying financial compensation and benefits, the Agreement requires KMC to work in good faith to accommodate Dr. Burton's disabilities.   The Agreement is to remain in "full force and effect, subject to . . . compliance with all the terms and requirements as set forth herein and according to The Graduate Medical Education Manual" (the "GMEM").   The Agreement also provides that "[t]he Parties further agree that under no circumstances will either Party terminate this Agreement prior to its expiration date without prior written notice and without providing the other Party the opportunity to discuss freely any differences, dissatisfactions or grievances that may exist."

16.     Aside from discussing differences, dissatisfactions, or grievances before termination, the Agreement mandates that a resident be given written notice.   Moreover, the Agreement directs KMC to comply with the Due Process Policy for Residents and Fellows ( the "Due Process Policy") in the "Housestaff Policy Manual."   The Due Process Policy requires that residents be placed on probation before termination, notified of the right to appeal being placed on probation, received at

least 60 days advance notice of termination, and received written notice of the right to appeal a termination decision.

17.     After Dr. Burton started her residency, she experienced recurring difficulties due to long-standing medical conditions affecting her attendance.   In October 2018, Dr. Burton met with Dr. Adam Fershko, and they discussed issues affecting her residency and the challenges she was facing.   Dr. Fershko was supportive and asked Dr. Burton if he could do anything to help, but otherwise took no action.   Dr. Fershko never indicated that Dr. Burton's attendance might cause her to be subject to disciplinary action or that she needed to undertake any specific corrective action in connection with her attendance or for any other reason.

18.     In December 2018, Dr. Schwartz met with Dr. Burton and conducted her six-month evaluation.   Dr. Burton's attendance was discussed, and at that time, Dr. Burton told Dr. Schwartz about her medical conditions.     In response to Dr. Schwartz's inquiries, Dr. Burton explained the difficulties she was experiencing because of her disabilities and the effect her disabilities were having on her attendance.   Dr. Schwartz responded to Dr. Burton's explanation by telling her that a resident had suggested that Dr. Burton might be experiencing a drug or alcohol problem.   Dr. Schwartz was unsympathetic to Dr. Burton's concerns, but she never told Dr. Burton that any disciplinary action was under consideration.   Regardless, Dr. Burton was in good academic standing and substantially meeting all attendance requirements.

19.     When Dr. Schwartz spoke to Dr. Burton about her attendance during her December 2018 year-end evaluation, she did not tell Dr. Burton that she could be subject to disciplinary action due to her attendance or that she had not met any performance requirement.   Dr. Burton was meeting or exceeding her residency performance expectations.   Notwithstanding and despite the lack of support from KMC and Dr. Schwartz, Dr. Burton received good evaluations during the first year

of her residency. Moreover, Dr. Burton scored second of all KMC's first-year residents on the Internal Medicine In-Training Examination and was ranked in the top 40% nationwide.

20. After meeting with Dr. Schwartz, Dr. Burton had no further communications with KMC concerning her disabilities until May 2019, when KMC gave her the name of a counselor she could contact. Before Dr. Burton(s annual June residency evaluation, she emailed Dr. Schwartz, further explained how her medical conditions were affecting her state of mind, and proposed strategies to improve her mental health. In the email, Dr. Burton requested that she be permitted to keep Dr. Schwartz informed via email about the status of her efforts and progress towards improving her mental health.

21. Dr. Burton met with Dr. Schwartz on June 4, 2019, for her year-end evaluation. During the evaluation, Dr. Schwartz told Dr. Burton that Dr. Burton's thoughts "were all over the place." In response to Dr. Burton's concerns, Dr. Schwartz was unreceptive and dismissive of her efforts to control her medical conditions. Dr. Schwartz did not offer any help or support or respond to Dr. Burton's request to keep Dr. Schwartz informed of her progress. Instead, Dr. Schwartz told Dr. Burton that an attending physician had given her a private evaluation, expressing concerns that Dr. Burton was exhibiting depression and anxiety.

22. On August 12, 2019, Dr. Schwartz met with Dr. Burton and told her she was being given an official warning about her tardiness and absences. Dr. Schwartz showed Dr. Burton a warning letter stating that she had been excessively absent and had failed to follow attendance procedures. In the August 12 letter, Dr. Schwartz warned Dr. Burton that failure to follow attendance procedures could potentially subject her to termination. The letter did not state that Dr. Burton was on probation or that she had any appeal rights. Although Dr. Schwartz required Dr. Burton to sign the warning letter, she refused to allow Dr. Burton to keep a copy of the letter.

23.     During the meeting on August 12, 2019, Dr. Schwartz told Dr. Burton that if she was going to be late or absent, she needed to contact her supervising physician and the program coordinator. Dr. Schwartz also accused Dr. Burton of having poor performance during the rotation.   However, she provided no examples, and Dr. Burton had never been told by anyone else that her performance was deficient.   The meeting with Dr. Schwartz on August 12 was the first time Dr. Burton was told that official disciplinary action was being taken against her.   At no time during the meeting or afterward did Dr. Schwartz ever tell Dr. Burton that she was on probation or that she had the right to appeal the disciplinary decision.

24.     On the morning of August 13, 2019, Dr. Burton sought counseling for stress and anxiety caused by her meeting with Dr. Schwartz the day before.   Dr. Burton contacted Dr. Hamilton, her attending physician and supervisor for the rotation, to let him know about the change in her schedule.   Dr. Burton also notified the program coordinator when she would be reporting to work, as Dr. Schwartz had instructed her.   After the counseling session, Dr. Burton started her intensive care assignments at about 11:15 a.m. and later met with Dr. Hamilton after he finished doing rounds.   During a noon conference, Dr. Schwartz mentioned to Dr. Burton that she knew that Dr. Burton had attended a counseling session that morning.   That afternoon, Dr. Burton reported to Dr. Hamilton at approximately 3:00 p.m. while he was performing a procedure.

25.     On August 14, 2019, Dr. Burton was still so feeling ill and distressed that she contacted the KMC program coordinator and inquired about requesting a leave of absence.   Upon confirming that she was eligible to take FMLA leave, Dr. Burton requested a FMLA leave application and initiated the FMLA leave application process.   KMC human resources provided Dr. Burton with instructions and the FMLA leave of absence documents for her physician to complete, and her request for FMLA leave was subsequently approved.   Dr. Burton remained on

FMLA through September 4, 2019.

26.     Shortly before the end of Dr. Burton's FMLA leave, she received an email instructing her to report directly to Dr. Schwartz when she returned to work.   On September 5, 2019, Dr. Burton met with Dr. Schwartz and was told that she was terminated for not reporting to work until 3:00 p.m. on August 13, 2019.   Although Dr. Burton tried to explain that her start time had been delayed, the she had followed the attendance procedure, and that on August 13 she was at work at 11:15 a.m., Dr. Schwartz refused to permit any discussion.   Instead, Dr. Schwartz gave her a letter dated September 5, 2019 (the "Termination Letter"), terminating Dr. Burton's employment and residency at Kettering Medical Center.   Exh. B.

27.     According to the Termination Letter, Dr. Burton's termination "is [sic] results from a failure to comply with the terms of the warning letter you [sic] given to you on August 12, 2019." The August 12 letter referenced in the Termination Letter is the disciplinary letter Dr. Schwartz showed Dr. Burton at their meeting on August 12.   The Termination Letter inaccurately lists purported "Significant Interventions for Improvements," and under the caption of "Events on August 13" is referenced a "Memo" by Dr. Hamilton that KMC claims is the justification for Dr. Burton's termination.   The Termination Letter did not state that Dr. Burton was ever previously on probation and did not advise her of her right to appeal the termination decision.   Dr. Burton did not receive prior written notice of the decision to terminate her, and Dr. Schwartz did not allow her to discuss the reasons for her termination.

28.     Despite KMC's lack of support, Dr. Burton successfully managed her disabilities to maintain her academic standing and meet KMC attendance requirements.   However, because of Dr. Burton's disabilities, her request for accommodations, and her need to take FMLA leave, she was viewed by KMC and Dr. Schwartz as damaged goods to be discarded.   KMC aided and

abetted by Dr. Schwartz and Dr. Hamilton, fabricated attendance issues.  To create this pretext, KMC terminated Dr. Burton without placing her on probation and without notifying her of her due process rights, including her right to appeal her termination.

29.     After the termination of Dr. Burton's residency, she requested a copy of the Housestaff Policy Manual referenced in the Agreement to review the Due Process Policy.  Approximately six weeks later, KMC informed Dr. Burton that KMC did not maintain a Housestaff Policy Manual but contained the KMC Due Process Policy in the GMEM.  Dr. Burton was subsequently provided with a copy of the GMEM, and upon learning of her appeal rights as stated in the Due Process Policy, she appealed her termination.  KMC has never responded as to whether Dr. Burton's appeal was accepted or rejected, and to Dr. Burton's knowledge, KMC has never acted on her appeal.

30.     After Dr. Burton's termination, she requested a letter of reference to apply to other residency programs.  Dr. Schwartz sent Dr. Burton a reference letter in response, falsely claiming that her residency was terminated because she had "significant episodes of absenteeism and tardiness."  Exh. C.  Dr. Burton had no "significant episodes" of tardiness, and the only significant episode of absenteeism was Dr. Burton's approved FMLA leave.  In the reference letter, Dr. Schwartz falsely asserted that the reasons for Dr. Burton's absenteeism and tardiness "seemed to vary widely" and that KMC had "implemented numerous intervention processes." KMC and Dr. Schwartz made these statements knowing them to be untrue, with the malicious intent of preventing Dr. Burton from securing employment in another residency program and obtaining a subsequent fellowship in interventional cardiology at KMC or elsewhere, to destroy Dr. Burton's medical career.

31.     Due to the termination of Dr. Burton's residency, Dr. Burton has suffered severe mental

anguish and emotional distress and has required medical care and treatment. The unlawful

discrimination by KMC, aided and abetted by Dr. Schwartz and Dr. Hamilton, has prevented Dr.

Burton from obtaining admission and employment in a residency program, has disrupted her

medical career, and have caused her to incur substantial financial damages. Furthermore, KMC,

aided and abetted by Dr. Schwartz and Dr. Hamilton, and as documented by Dr. Schwartz's

purported letter of reference, have humiliated, disgraced, and defamed Dr. Burton, disrupting her

medical career, ruining her reputation, and causing her continuing and irreparable injury and loss.

### First Cause Of Action
(Breach of Contract)

32.     Dr. Burton hereby incorporates paragraphs 1 through 31 as if fully rewritten herein and

further states that:

33.     Under the Agreement between KMC and Dr. Burton, KMC was obligated to provide Dr.

Burton with a suitable environment for a productive residency experience and was required to give

Dr. Burton prior written notice before terminating her residency. KMC was also further required

to allow Dr. Burton to freely discuss any differences, dissatisfactions or grievances that may have

existed before terminating her residency. In breach of the Agreement, KMC terminated Dr.

Burton's residency without prior notice and without providing her any opportunity before

terminating her to discuss any objections that she might have to the decision to terminate her

residency.

34.     The Agreement further requires KMC to comply with KMC's Due Process Policy, using

progressive discipline to address issues of deficient performance, and to place Dr. Burton on

probation to allow her to correct any performance deficiency before termination. Furthermore,

the Due Process Policy requires that Dr. Burton receive written notification that she had been

placed on probation and her rights to appeal the probation. In breach of the Agreement and in

violation of KMC's Due Process Policy, KMC presented Dr. Burton with the August 12 letter threatening her termination without first placing her on probation, without notifying her of her appeal rights, and without permitting her to keep a copy of the August 12 letter.

35. In breach of the Agreement, KMC terminated Dr. Burton's residency without prior written notice and without providing her "the opportunity to discuss freely any differences, dissatisfactions or grievances that may exist . . . ." In breach of the Agreement, KMC terminated Dr. Burton's residency in violation of KMC's Due Process Policy, requiring KMC to provide her with written notification of her rights to appeal the termination of her residency. Using the pretext of false allegations that Dr. Burton had failed to meet attendance requirements to justify the termination of her residency, KMC disregarded her contractual rights to due process, denying her the right to be heard before terminating her residency. In breach of the Agreement, KMC terminated Dr. Burton's residency in violation of the Due Process Policy without notifying her of her right to appeal the termination of her residency.

36. As a direct and proximate result of KMC's breach of contract, Dr. Burton has suffered injuries and damages, including loss of employment, employment income, benefits, and prospective employment, and the costs of pursuing this action. Dr. Burton's damages and costs incurred due to KMC's breach of the Agreement were foreseeable when the parties entered the Agreement. The total amount of Dr. Burton's damages due to KMC(s breach of the Agreement have not yet been fully ascertained, including injuries that are not fully compensable by monetary damages alone. These injuries include the disruption of Dr. Burton's medical career and the loss of employment opportunities. Accordingly, in addition to monetary damages, Dr. Burton is entitled to injunctive relief, including her reinstatement into the KMC internal medicine residency program.

37.     As a direct and proximate result of KMC's unlawful conduct in violation of the Rehabilitation Act, Dr. Burton has suffered injuries and damages, including mental anguish and emotional distress, humiliation and embarrassment, disruption of her medical career and the loss of prospective employment, loss of employment, employment income and employment benefits, and other costs including attorney fees and the costs of pursuing her claims herein. The full amount of such damages has not yet been fully ascertained and shall be more fully detailed at the trial of this action.

**Second Cause of Action**
(Discrimination in Violation of the Ohio Civil Rights Act)

38.     Dr. Burton hereby incorporates paragraphs 1 through 37 as if fully rewritten herein and further states that:

39.     At all times relevant hereto, Dr. Burton has disabilities that substantially impair her major life activities and has been perceived and regarded by the Defendants as having such disabilities. KMC, Dr. Schwartz, and Dr. Hamilton are employers as defined by R.C. § 4112.01(2) and are prohibited by the Ohio Civil Rights Act from discrimination based on disability or aiding and abetting in unlawful disability discrimination. Notwithstanding Dr. Burton's disabilities, she is otherwise qualified and capable of successfully performing the duties of her position, and throughout her employment at KMC has successfully performed all the responsibilities and duties of her internal medicine residency.

40.     Following Dr. Burton's termination, she attempted to appeal the termination decision, asserting her contractual appeal rights, the denial of due process, and that the decision to terminate her residency was motivated by unlawful disability discrimination. In retaliation against Dr. Burton for asserting disability discrimination, Defendant KMC intentionally and maliciously

refused to consider her appeal and have refused to respond to her appeal. Worse yet, KMC and Dr. Schwartz subsequently issued a letter of reference, knowingly, intentionally, and maliciously designed to prevent Dr. Burton from obtaining an internal medicine residency in another residency program and the subsequent interventional cardiology fellowship at KMC or elsewhere to destroy Dr. Burton's medical career.

41.     Defendant KMC, aided and abetted by Dr. Schwartz and Dr. Hamilton, and in violation of the Ohio Civil Rights Act § 4112.02 (A) and (J), have intentionally and maliciously discriminated against Dr. Burton because of her disabilities or perceived disabilities, by (1) subjecting her to unwarranted disciplinary action and by terminating her residency and employment without just cause in violation of the Agreement and KMC's Due Process Policy; (2) by using Dr. Burton's attendance as a pretext to discriminate against her to justify the termination of her employment; and (3) by denying Dr. Burton her contractual due process rights to prevent Dr. Burton from successfully appealing the termination of her residency.

42.     As the direct and proximate result of KMC's discrimination and retaliation, Dr. Burton has suffered injuries and damages, including mental anguish and emotional distress, humiliation and embarrassment, disruption of her medical career and the loss of prospective employment, loss of employment, employment income and employment benefits, and other costs including attorney fees and the costs of pursuing the claims herein. Under R.C. § 4112.99, as the conduct of Defendants was intentional and malicious, Dr. Burton is entitled to recover attorney fees and punitive damages. The full amount of such damages has not yet been fully ascertained but is more than $1,000,000.00 and shall be more fully detailed at the trial of this action.

**Third Cause of Action**
(Discrimination in Violation of the Rehabilitation Act)

43.     Dr. Burton hereby incorporates paragraphs 1 through 42 as if fully rewritten herein and further states that:

44.     At all times relevant hereto, Dr. Burton has disabilities that substantially impair her major life activities and has been regarded by the Defendants as having such disabilities. The KMC internal medicine residency program is a substantial recipient of federal funding and is prohibited by the Rehabilitation Act from discrimination based on stereotypes about disabilities. Notwithstanding Dr. Burton's disabilities, she is otherwise qualified and, throughout her employment at KMC, has successfully performed all the responsibilities of her internal medicine residency, including attendance requirements.

45.     Defendant KMC has intentionally discriminated against Dr. Burton because of her disabilities based upon stereotypes about disabilities by (1) subjecting Dr. Burton to unwarranted disciplinary action and by terminating Dr. Burton without just cause in violation of KMC's Agreement and the Due Process Policy; (2) holding Dr. Burton to a higher standard of attendance and denying Dr. Burton the contractual rights that are provided to KMC residents who are not disabled; (3) using Dr. Burton's attendance as a pretext to discriminate against her and to justify the termination of her residency; (4) denying Dr. Burton's contractual due process rights to prevent Dr. Burton from successfully challenging the termination of her residency; (5) denying Dr, Burton the right to be heard before terminating her residency and (6) retaliating against Dr. Burton for asserting that she was terminated because of her disabilities.

46.     As a direct and proximate result of KMC's unlawful conduct in violation of the

Rehabilitation Act, Dr. Burton has suffered injuries and damages, including mental anguish and emotional distress, humiliation and embarrassment, disruption of her medical career and the loss of prospective employment, loss of employment, employment income and employment benefits, and other costs including attorney fees and the costs of pursuing the claims herein.  The full amount of such damages has not yet been entirely ascertained and shall be more fully detailed at the trial of this action.

### Fourth Cause of Action
(Tortious Interference With A Prospective Contractual Relationship)

47.    Dr. Burton hereby incorporates paragraphs 1 through 46 as if fully rewritten herein and further states that:

48.     When Dr. Burton interviewed with KMC for her internal medicine residency, she told Dr. Schwartz that she was applying to KMC because KMC offered an interventional cardiology fellowship.  KMC and Dr. Schwartz hired Dr. Burton, knowing that after she completed her residency, she intended to apply for an interventional cardiology fellowship, whether at KMC or at some other accredited medical institution.  During Dr. Burton's residency, Dr. Hamilton became aware of her aspirations to specialize in interventional cardiology and that she would be pursuing an interventional cardiology fellowship upon completing her residency.

49.     Motivated by unlawful discriminatory animosity, the Defendants intentionally and maliciously terminated Dr. Burton's residency and aided and abetted in terminating her residency, justifying her termination on the false pretext of deficient attendance.  Defendants KMC and Dr. Schwartz terminated Dr. Burton and then wrote a derogatory letter of reference, knowing that the termination of her residency and the pretextual references in the letter concerning her attendance

would interfere with and prevent her from obtaining another residency, and subsequently, an interventional cardiology fellowship, whether at KMC or at some other accredited medical institution.

50.    As a direct and proximate result of the Defendants' unlawful, intentional, and malicious termination of Dr. Burton's residency and employment, Defendants have interfered with and have prevented Dr. Burton from obtaining alternate employment. Consequently, Dr. Burton has lost prospective employment in KMC's interventional cardiology fellowship and prospective employment with other institutions offering internal medicine residencies and fellowships in interventional cardiology.

51.    As a direct and proximate result of the Defendants' unlawful, intentional, and malicious conduct, Dr. Burton has suffered injuries and damages, including mental anguish and emotional distress, humiliation and embarrassment, disruption of her medical career, and the loss of prospective employment, loss of employment, employment income and employment benefits, and other costs including attorney fees and the costs of pursuing the claims herein. As the Defendants' actions were intentional and malicious, Dr. Burton is entitled to an award of punitive damages and attorney fees. The total amount of Dr. Burton's damages has not yet been fully ascertained but is more than $1,000,000 and shall be more fully detailed at the trial of this action.

WHEREFORE, Dr. Burton respectfully requests this Court grant judgment providing for declaratory and injunctive relief and award damages as follows:

(1)    That Defendant KMC has breached its Agreement with Dr. Burton, that she is entitled to an award of compensatory damages, and that damages Dr. Burton has incurred were foreseeable, including lost income from future employment incurred because of the delay and injury to her medical career;

(2)    That Dr. Burton is disabled and can perform the essential functions of an internal

medicine residency with or without reasonable accommodations, that Defendants have unlawfully discriminated against Dr. Burton in violation of the Rehabilitation Act and the Ohio Civil Rights Act because of her disabilities, and that Dr. Burton's damages include lost income from future employment incurred because of the delay and injury to her medical career;

(3)     That the Defendants have intentionally interfered with Dr. Burton's prospective contractual relationships, including her candidacy for KMC's interventional cardiology fellowship and prospective employment with other institutions offering internal medicine residencies and fellowships in interventional cardiology;

(4)     That Dr. Burton's injuries include injuries and loss that are not fully compensable by monetary damages alone, and that in addition to monetary damages, Dr. Burton is entitled to injunctive relief, including reinstatement into the KMC internal medicine residency program;

(5)     That as a result of Defendants' unlawful discrimination and unlawful interference with Dr. Burton's prospective contractual relationships, Dr. Burton has suffered severe emotional distress and mental anguish, and is entitled to the recovery of compensatory damages arising therefrom; and

(6)     That the Defendants' conduct to unlawfully discriminate and unlawfully interfere with Dr. Burton's prospective contractual relationships was knowing, intentional and malicious. Dr. Burton is entitled to compensatory and punitive damages in an amount not yet ascertained but to be determined, including costs, reasonable attorney fees, and pre-judgment and post-judgment interest.

In conjunction with and in addition to the foregoing relief, Dr. Burton respectfully demands judgment against the Defendants upon such further evidence as is provided, including declaratory and injunctive relief and an award of damages in an amount not yet fully ascertained but as yet to be determined and more than $1,000,000.00, together with compensatory and punitive damages, pre-judgment interest, interest, costs herein expended, reasonable attorney fees, and such other relief as the Court finds just.

Respectfully submitted,

FOLKERTH + ROUTH PLL


/s/ John R. Folkerth, Jr.
John R. Folkerth, Jr. (0016366)
Trial Attorney for Jenna Burton, D.O.
3033 Kettering Blvd.
Point West II, Suite 111
Dayton, Ohio 45439
(937) 260-4202
jfolkerth@wfrlawyers.com


### JURY DEMAND

Now comes the Plaintiff, Jenna. Burton, D.O., pursuant to Civil Rule 38, and hereby demands a trial by jury herein.

/s/ John R. Folkerth, Jr.
John R. Folkerth, Jr.


### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing has been electronically filed with the Clerk of Courts using the CM/ECF system, which will serve notification of such filing for all parties on this 18th day of May, 2020.

/s/ John R. Folkerth, Jr.
John R. Folkerth, Jr.

**KETTERING MEDICAL CENTER**
**GRADUATE MEDICAL EDUCATION AGREEMENT**

The Kettering Medical Center, a nonprofit, charitable corporation, Kettering, Ohio, **"KMC" and Jenna K. Burton, D.O.,** hereinafter referred to as **"Resident",** in consideration of the following mutual covenants, hereby enter into an agreement of graduate medical education **"Agreement"** subject to the terms and conditions listed.

**TITLE OF TRAINING PROGRAM: Internal Medicine Residency**

**DURATION of AGREEMENT: July 1, 2018 – June 30, 2021**

| | |
|---|---|
| **FINANCIAL SUPPORT:** | **$54,309** annual stipend, payable in equal allotments calculated by taking the annual salary divided by 26 pay periods (biweekly gross pay), less applicable taxes. |
| **VACATION:** | All Residents are eligible for 15 working days of paid vacation each year. This time may not be carried over from year to year. The Program Director reserves the right to restrict vacation from being taken at a particular time or during a specific rotation as referenced in the Housestaff Manual. |
| **PROFESSIONAL LIABILITY INSURANCE:** | Coverage is provided for all activities within the scope of the Resident's duties within the training program. This does not cover unauthorized activities or moonlighting. Coverage provides defense and protection against awards from claims reported or filed after the completion of training, if the alleged acts or omissions of the Resident occurred during the training program and are within the scope of the training program. |
| **DISABILITY INSURANCE:** | Short-term and long-term disability insurance plans will be provided as a core Benefit. Additional options to increase coverage may be purchased by the Resident. Human Resources provide a full description of each plan at the time of benefit selection. |
| **HEALTH, DENTAL, VISION INSURANCE:** | Basic coverage for health and dental insurance is available to the Resident at the standard employee rate. The Resident may also purchase vision coverage and additional dental coverage. |
| **QUALIFICATION FOR EMPLOYMENT:** | For any applicant considered for hire after January 1, 2012, use of tobacco or nicotine products in any form will automatically disqualify the applicant from being hired. This is in keeping with the organization's mission to "improve the quality of life of the people in the communities we serve." The post-offer, pre-employment testing will include screening for nicotine. A positive test for nicotine will disqualify the applicant for employment. Employment applicants are asked about the use of tobacco and nicotine replacement and are screened for nicotine before they are hired. Applicants who declare use or screen positive for nicotine or who test positive for tobacco or nicotine use will be disqualified and job offers will be rescinded. |
| **LIFE INSURANCE:** | A group term life insurance policy is provided equal to one year's salary at no cost to the Resident. This plan is portable and may be transferred to an individual policy. The Resident may purchase additional options. |

Jenna K. Burton, D.O.                                                                      Page 2

**COUNSELING SERVICES:**   KMC's Employee Assistance Program (EAP) offers free confidential support and referral services in resolving emotional stress, family, marital, financial, substance abuse, crisis intervention and job related problems for the Resident. Mental health services are also offered under employee health benefits.  Limits are specified in the Schedule of Benefits for the health insurance selected.

**PHYSICIAN IMPAIRMENT:**   The Resident Physician Impairment Policy addresses the issue of Resident impairment, including that due to substance abuse, and outlines the program established for therapy and rehabilitation.  (Referenced in the Housestaff Policy Manual.)

**ACCOMMODATION FOR DISABILITIES:**
KMC has a policy of accommodating residents with disabilities.  KMC will work in good faith with qualified residents and applicants with disabilities to determine whether a reasonable accommodation of their disability can be provided without creating an undue hardship or a direct threat of harm to employees, patients, the residency program or others consistent with the provisions of the Americans with Disabilities Act and KMC Policy HR-22.

**DEPARTMENTAL LEAVE:**   The Departmental Leave Policy incorporates Sick Leave, Professional (Educational) Leave, Leave of Absence, and Parental Leave, as referenced in Housestaff Policy Manual.  The program director has responsibility to preserve the integrity of the residency program and the continuity of scheduled rotations. Any time off is approved based upon the attendance policies of KMC and the rules of the Family/Medical Leave Act.

**DUTY HOURS:**   Specific hours of duty are determined in accordance with ACGME Institutional and Program Requirements to include the specific number of hours on duty, days off, hours on-call, and rest periods.  ACGME duty hour requirements are also outlined in the institutional and program policies and procedures made available to the resident.

**MEALS, UNIFORMS/
LAUNDRY, & LIVING
QUARTERS:**   Meals are provided while on duty, (including scheduled Night Call), up to a meal allowance limit of $250.00 per month.  Three lab coats are issued upon entering the program.  Two replacement lab coats can be ordered within the first two months of each contract year.  Laundry service is provided for lab coats. During duty hours, living quarters are provided at both KH and SH that include individual sleep rooms, lounge, and lockers.

**RESTRICTIVE COVENANTS:**   In compliance with ACGME essentials, KMC does not require residents to sign a non-competition guarantee upon leaving the training program.

**NON-RENEWAL OF
AGREEMENT:**   Written notice of the intent to demote, not advance, or not re-appoint must be provided to the Resident by the program director no later than four months prior to the end of the Resident's current Agreement.  If there is any dispute or complaint on any issue, the Due Process Policy for Residents and Fellows has been established as referenced in the Housestaff Policy Manual.  The Due Process Policy provides for adjudication of the Resident complaints and grievances related to actions that could result in probation, demotion, non-advancement, non-reappointment, suspension or termination of the Resident.  If the Resident is suspended or placed on probation at any time during the four months preceding renewal of the Agreement, an addendum to the Agreement will be issued.  This addendum shall amend the term of the Agreement and allow for early termination of the Agreement if the Resident fails to meet

Jenna K. Burton, D.O.                                                                                   Page 3

established goals and standards.  The Resident will not be promoted during a
probationary period.

**TERM AND TERMINATION:**    Unless sooner terminated as provided herein, this Agreement shall remain in full
force and effect for the entire term of the residency, subject to successful annual
review, adequate progression in the program, and compliance with all the terms
and requirements as set forth herein and according to The Graduate Medical
Education Manual . Resident acknowledges and agrees that Hospital may
terminate this Agreement immediately should these standards not be met.

**ANNUAL REVIEW:**    The annual review of Resident's performance and progress in the program shall
be conducted and completed during each academic year. The salary will be
adjusted based on promotion to the next level of training.  Should Resident's
performance and progress be determined as not sufficient to continue in the
program, or in compliance with the Graduate Medical Education Manual, this
Agreement shall be terminated as set forth above.

**ACCESS TO RECORDS:**    Until the expiration of seven (7) years after the furnishing of services pursuant
to this Agreement, Resident agrees to make available, upon written request to
the Secretary of Health and Human Services, or upon request to the Comptroller
General of the United States, or to any of their duly authorized representatives,
this Agreement, and books, documents and records of Resident that are

necessary to certify the extent of any costs of the Hospital arising from this Agreement.  Further, if Resident carries
out any of the duties arising from this Agreement, through a subcontract, with a
value or cost of $10,000 or more over a twelve (12) month period, with a related
organization, such subcontract shall contain a clause to the effect that until the
expiration of seven (7) years after the furnishing of such services pursuant to
such subcontract, the related organization

shall make available, upon written request to the Secretary of Health and Human
Services, or upon request to the Comptroller General, or any of their duly
authorized representatives, the subcontract, and books, documents and records
of such organization that are necessary to verify the nature and extent of such
costs.

**Kettering Medical Center agrees to provide:**
1.    A professional environment in which the educational experience and curricular requirements can
be met with fair treatment for the resident.
2.    A training program that meets the standards of the specialty board and the special requirements
established by the Accreditation Council for Graduate Medical Education.
3.    Reasonable notice to the resident of any intent to reduce the number of approved residency
positions, or to close a residency program.
4.    An environment and opportunity for scholarly activity.

**The Resident agrees to:**
1.    Develop a personal program of self-study and professional growth.
2.    Perform satisfactorily and to the best of his/her ability the customary services of the postgraduate
training program as defined by the ACGME Essentials.
3.    Participate fully in any process directed toward HFAP or AOA accreditation or the certification or
accreditation of the Hospital and/or Program by any other agency.
4.    Conform to all Hospital policies, rules and regulations governing house officers and the
corresponding policies of other participating institutions in which he/she rotates.  Abide by all
KMC policies regarding sexual and other forms of harassment as referenced in the Housestaff
Manual.

Jenna K. Burton, D.O.                                                                                         Page 4

5.      Complete all annual physical requirements through Employee Health; participate in all annual
        mandatory requirements, including Safety Education and Corporate Integrity.
6.      Provide proof of graduation from an approved medical school and, if applicable, provide a valid
        ECFMG certificate before the execution of this Agreement.
7.      Authorize KMC to share identifying and historical information, including but not limited to name,
        social security number, etc., with other institutions and regulatory bodies, in order to fulfill
        requirements of law, risk management and to obtain any reimbursement from Medicare of other
        payers.

8.      Refrain from engaging in employment outside the training program not authorized in writing by
        the program director.  (Referenced in the Housestaff Policy Manual under Outside Employment-
        Moonlighting.)

**The Parties mutual agree:**
1.      The Parties have entered into this Agreement in good faith and acknowledge their respective
        ethical, moral and legal obligations to fulfill this Agreement until its expiration date.

2.      The Parties further agree that under no circumstances will either Party terminate this Agreement
        prior to its expiration date without prior written notice and without providing the other Party the
        opportunity to discuss freely any differences, dissatisfactions or grievances that may exist.


Robert T. Smith, M.D.                                       Date    3/20/18
Vice President Medical Affairs


John Shrader, M.D.                                          Date    3/20/2018
Director Medical Education


Jenna K. Burton, D.O.                                       Date    4/10/18
Resident Physician

## <u>ADDENDUM TO RESIDENT CONTRACT</u>

**FINANCIAL SUPPORT**     **$6000 annual stipend**

> <u>**ADDENDUM:**</u> In addition to the annual stipend, internal medicine residents will receive an **annual Primary Care Bonus of $6,000. This will be paid at the rate of $1,500 per quarter.** Payments will be included in the first paycheck of each quarter.
>
> In the event the contract is terminated by either party prior to completion, KMC reserves the right to recover any or all of this bonus amount from the resident physician.

_____
Resident

4/10/18
_____
Date

*Finance\IM Bonus Contract.doc*



3535 Southern Boulevard
Kettering, OH 45429
937.298.4331
ketteringhealth.org/kettering

**September 5, 2019**

Jenna Burton, D.O.
705 Belauto Ct.
Apt. G
Beavercreek, OH 45430

Dear Jenna Burton, D.O.,

This letter is to inform you that your employment as an internal medicine resident at Kettering Medical Center will end as of today, September 5, 2019. The reason for your termination is results from a failure to comply with the terms of the warning letter you given to you on August 12, 2019.

### Significant Interventions for improvement:
October 15, 2018- Meeting with Dr. Fershko to address tardiness and absenteeism
December 17, 2018- 6th month evaluation
May 20, 2019- Coaching session/Professional Tool with Dr. Schwartz
June 4, 2019- Summative evaluation
August 12, 2019- Warning Letter

### Events on August 13:
Memo provided by Dr. Josh Hamilton

### Financial Terms
Your last pay check will be dated August 12, 2019 and will not be issued until the items requested have been returned.  You will not receive any benefits or vacation.

### Company items to be returned:
Name/Meal Badge
Lab Coats

Regards,

Lyndi Schwartz, M.D., FACP
Program Director Internal Medicine

Amy Hoeffel
Administrative Director, GME



3535 Southern Boulevard
Kettering, OH 45429
937.298.4331
ketteringhealth.org/kettering

April 3, 2020

Dear program director,

Dr. Burton has asked me to write a letter of recommendation for her for position at your residency program.  Dr. Burton began her residency here in July 2018, after having attended and completed medical school at Lincoln Memorial University.  We found her to be a bright, knowledgeable and empathic physician.  She had genuine concern for her patients and provided good patient care.  She stayed calm under the urgent or emergent situations and procedures.  She spent good quality time with her patients developing relationships and involving them and patient centered care.  On the Internal Medicine In-Training Examination she was in the top 40% of interns in the country demonstrating again her solid knowledge base.  From a standpoint of patient care, knowledge and the ability to establish good rapport with her patients she did a good job.

We found that Dr. Burton had challenges with attendance, manifesting as tardiness and absenteeism.  We tried to get to the bottom of what was causing these significant episodes of absenteeism and tardiness and the reasons seemed to vary widely.  We implemented numerous intervention processes without avail and had to terminate her from the program.  She is applying for continued training at your institution and in the interest of total transparency this letter has been provided to you with the requisite information.

In summary, Dr. Burton had good medical knowledge as well as patient care skills and a demonstrated ability to establish a therapeutic relationship with her patients.  The issues related to absenteeism were a major obstacle to her success in our program.  Should you have any further questions you may contact me at our Internal Medicine residency program either by phone or email (Lyndi.Schwartz@KetteringHealth.org).

Best Regards,

Lyndi Schwartz MD FACP
Program Director Internal Medicine Residency
Kettering Medical Center
Vice Chair Department of Medicine
Wright State University Boonshoft SOM
Associate Clinical Professor
Wright State University Boonshoft SOM
Assistant Clinical Professor
Loma Linda University SOM
937-395-8693